United States Court of Appeals for the Ninth Circuit is now in session. Good morning and welcome to the Ninth Circuit. Before we begin, Judge Tallman and I want to thank Judge Lopez of the First Circuit in Maine for helping us out. We really can't do our job without help from our visiting judges. Thank you very much. It's a great pleasure to be here. Appreciate it. Welcome back. Thank you so much. Nice to see you. You too. Before we begin, we have three cases that have been submitted on the briefs. They are United States v. Gonzalez Vasquez, United States v. Mild, and Syscom v. Macadema. And those cases have been submitted. Our first case on the calendar is United States v. Aldana. And Ms. Rivera, you can begin whenever you're ready and tell us if you want to reserve some time for rebuttal. Thank you, Your Honor. And may it please the Court. Gabriela Rivera, on behalf of Appellant Juan Javier Brisuela Aldana, I'd like to reserve two minutes and I will keep an eye on my own clock. This Court should find that Mr. Brisuela Aldana satisfies the fundamental unfairness requirement of Section 1326D3 because he was ordered removed in absentia, even though he never received the notice the statute requires before an immigration judge can take such a drastic measure. At the time he litigated his motion to dismiss, he was not required to make any showing beyond a prejudicial due process violation. And because that framework has since changed, this Court should remand so that Mr. Brisuela can show that he can meet the additional requirements of Section 1326D1 and D2. And unless the panel points me in a different direction, my plan is to focus on the lack of statutorily compliant notice to appear and the fundamental unfairness requirement at Section 1326D3 so that the Court can remand. I thought the government had basically conceded the first two prongs, so it seems to me the case turns on the fundamental unfairness prong. Does it not? Thank you, Your Honor. I do plan to focus on the fundamental unfairness prong at Section 1326D3. And so, you know, what I'd like to do is I want to start with a case that's directly on point, and that's this circuit's recent decision in Singh v. Garland that was just announced on Friday, February 4th, three days ago, and that was the subject of two 28-J letters just this Friday. And there, this circuit joined the Fifth Circuit in holding that the unmistakable analysis and holdings in Pereira and Ms. Chavez require that the notice requirements in Section 1229A apply equally in the in absentia context. And in Singh, the Court held that the Supreme Court's decisions in Pereira and Ms. Chavez, along with the statutory text, require that before an immigration judge can order an in absentia removal, the non-citizen first has to have been provided with a notice that satisfies the requirements in 1229A1. For this reason, you know, because Mr. Briswell Aldana, it's undisputed that he was never satisfied with notice that meets those requirements. And so, for these reasons, Mr. Briswell Aldana satisfies Section 1326D3. Can you address the prejudice element of the fundamental unfairness? I mean, is there, what is the plausible basis that he would not have, that he would have received voluntary departure here? I'm happy to address whether Mr. Briswell Aldana possibly could have received voluntary departure. I do think that because he satisfies D3, because he was ordered by an immigration judge, even though the statutory prerequisite had never been met, meaning that the immigration judge actually couldn't have ordered that in absentia removal in the first instance. And so, because of that, he satisfies D3. Congress said that before an immigration judge can take such a drastic measure, the notice has to be detailed. It has to explain the charges against the non-citizen, the non-citizen's obligations, and the proceedings all in one document. So, what we're really talking about... Didn't the Supreme Court tell us that that he has to satisfy all three independently? That's correct. I have the same concern that my brother Lee has, in terms of whether or not he's prejudiced. Did he have a plausible voluntary departure claim with a voluntary manslaughter conviction? And I guess there were some other crimes on his rap sheet as well. So, a couple of answers to that, Your Honor. Section 1326 D3 requires that the removal have been fundamentally unfair. D1 and D2 go to administrative exhaustion and deprivation of judicial review. One way this circuit has said that a non-citizen can meet the fundamental unfairness requirement is to show a due process violation that prejudiced the non-citizen. That's the question is, how was he prejudiced? And you're dancing around it, but you're not answering the question. And what I'm trying to get at, Your Honor, is that in certain circumstances, the very fact that a non-citizen was ordered removed when he should not have been here because the immigration judge simply didn't have the authority to do so, that per se meets the requirements of Section 1326 D3. This is like Aguilera-Rios. I'm not sure I'm reading the Supreme Court cases the same way. So, just answer the question. I understand your argument. In essence, it's a per se prejudice argument. Let's assume, for the sake of my question, that there is no per se prejudice. What is the basis that he could show that it was plausible that he would have been granted voluntary departure? To the extent that he needs to show prejudice beyond the lack of a statutorily compliant NTA, he can do so. He was eligible for voluntary departure. The government conceded this below. That's at ER 13. Pre-conclusion voluntary departure does not require that the non-citizen have accrued more than one year of continuous presence in the United States. And importantly, the plausibility inquiry looks at the circumstances as they existed at the time of the removal proceedings. So, we need to look at what his circumstances were in 2005. And that means that any subsequent arrests or convictions are simply irrelevant for this inquiry. So, what's going to happen if we reverse and remand? What's going to happen to him? Maybe this is a question for Ms. Woodhead, but what will DHS do if we send this back? And your honor, I can't answer what DHS might do if this case is sent back to the district court. But what I can say is that there's very good reason to think that to the extent this is remanded, that Mr. Bristol can show that he can satisfy D1 and D2. What would be the basis for his claim of voluntary departure if it went back to the agency? Because at this point, wouldn't the agency be looking at everything that's happened since 2005? Not at all, your honor. This is about whether the removal proceeding that took place in 2005 satisfied procedural... Counsel, for purposes of the question, I understand all that. But the question is, if we send it back, I guess we would dismiss the or direct the district court to vacate and dismiss the indictment. But then the question becomes, what relief would he be eligible for given everything that's transpired since 2005? And this is exactly what I'm trying to answer, your honor. The prejudice inquiry, the plausibility inquiry looks at the circumstances as they were at the time of the removal proceedings in 2005. So that didn't change when he litigated this in 2018. Why couldn't the government just simply initiate new removal proceedings without regard to what happened in 2005? The government absolutely could, your honor. They could reinstate his prior removal order. But that wouldn't have any bearing on whether the 2005 removal proceeding was fundamentally fair. All right. Well, maybe Ms. Woodhead will be able to answer my question. Counsel, can I ask, this may be off point, don't hesitate to tell me so, but isn't there a potential argument that we should defer a decision here until en banc proceedings that are now taking place before the Ninth Circuit are finished? Because I think there is an argument out there that given all the defects in the notice here, that the immigration tribunal never had the opportunity to do that. I don't think the Ninth Circuit has resolved that. It may not be ultimately a winning argument, but if it is still out there, wouldn't that suggest that we should defer a decision here until that issue is resolved? Yes, please, what's your position on that? To the extent that your honor is referring to the en banc review and Bastide-Hernandez, that's not directly on point here. At issue in Bastide was whether an agency can promulgate its own regulations that set the boundaries of its subject matter jurisdiction and whether an NTA's failure to comply with those regulations deprives the immigration court of subject matter jurisdiction to do anything at all with the case. And here, it's not really a question of the immigration judge's authority to hear the case in the first instance or to take certain dispositions. For example, the immigration judge could have granted pre-conclusion voluntary departure because that's not at all pegged to the notice requirements at 1229A. He could have terminated proceedings. He could have ordered DHS to issue a statutorily compliant notice to appear. So there's no real dispute here that, you know, we're talking about the statutory authority of the immigration judge, not the subject matter jurisdiction. To the extent that I see that I'm very short on time and I'd like to reserve what I have left. We'll give you an extra couple of minutes on rebuttal. Thank you. Ms. Woodhead, whenever you're ready. May it please the court. Consuelo Woodhead on behalf of the United States. There is no basis for vacating the conviction in this case for three separate reasons. First, the government did not concede that D-1 and D-2 were met in this case. If you review the District Court, which is at ER 96 to 99, you will see that the government specifically argued that even if defendant could establish the defect and prejudice prongs of D-3, he had failed to meet the requirements of D-1 and D-2. And the government cited case law predating Palomar-Santiago in support of that claim. And at pages 98, 99, the government argued that this court's automatic excusal line of cases were distinguishable and had never been applied in the situation of an alien removed in absentia. Counselor, in this case, he voluntarily withdrew his motion to reopen. Is that correct? Correct. That I gather is the basis for your argument that there was a failure to exhaust. Is that correct? Precisely. He voluntarily abandoned it. And the document in which he did that, which he can't challenge at this point, he introduced that withdrawal into evidence in District Court. In District Court, he represented that he wrote to the IJ seeking to withdraw his motion. In his opening brief to this court, he represented again that he wrote to the IJ and the document bears his signature. So there is no question, even under the state of the law predating Palomar-Santiago, that in this case, the defendant failed to exhaust an available administrative remedy. There's no question following Friday's decision and saying that had he pursued that, he would have had an available remedy because he does have a claim that he did not receive notice in accordance with Section 1229A. And under 1229a, not in parens, B5C2, he could make that motion at any time. And he did. And then he walked away from it because he didn't want to remain in custody while it took the time to have that adjudicated. So absolutely, I think the kind of shortest and straightest path to affirmance in this case is his failure to exhaust administrative remedies. So what's the answer to the question that I kept asking your opposing counsel? Well, I think if you remand this case, nothing is going to happen in the short run is the short answer. The defendant is not in the country. He was removed ages ago. So there will be no defendant there to have any proceeding against. The only issue that we're really deciding here is whether or not his criminal conviction for illegal reentry has to be vacated. Correct. That is correct. All right. And it doesn't for the failure to establish a due process violation. To establish a due process violation based on defective notice, he has to meet the standard set forth in years ago in Millane v. Central Hanover Bank that the notice was not reasonably calculated under the circumstance to apprise him of the pendency of the action. And he can't meet that standard. The use of a two-step process under current law did violate statutory requirements and made the removal order subject to rescission had he pursued that to conclusion. But it did not rise to the level of a constitutional violation. Farhood v. INS is still good law on that point as are Kahn and all the other cases we've cited that talk about what a due process notice claim must be based on. And here the notice was adequate because it was set to the address defendant provided. If I can go back to your earlier point about exhaustion. Should we consider remanding it back to the district court since the district court had assumed exhaustion had been met? Should we remand it and let the parties read it further, develop any factual record and let the reason or need to do that because the record is clear that the defendant voluntarily abandoned his motion to reopen. There's nothing he can say that will change that fact. And in addition, above and beyond that, he did not exhaust the TPS remedy that he applied for. It was in the briefing and perhaps the opposing counsel will address this in a rebuttal that there may be factual disputes about what he understood when he filed that motion to withdraw. Now there may be an issue about how knowing that step was so that there may still be an issue about the exhaustion. Respectfully, I don't think so. He stated in the withdrawal what his reason was. He said, I do not wish to remain in custody any longer. I would like to be returned to my home home country. That's what he said. And I believe the court is entitled to take him at his word on that. Go ahead. I'm sorry. I was going to ask if we were to remand it, how could the district court conduct an evidentiary hearing if the defendant is no longer president in the United States? I don't think the district court effectively could. If the court, first of all, you have to find that there's a due process violation and prejudice before he even gets to vacate the sentence. I'm sorry, vacate the conviction. But I don't know. I don't know the extent to which he could. The court could certainly not hold an evidentiary hearing without a person there. He could not create a record by submitting a declaration without being prepared to come into court, which he can't do because he's not in the country. Well, I suppose you could parole him in if he could be located wherever he is now. The last I understood, and Mr. Rivera can correct me. I don't think counsel even knows where he is or how to reach. Well, that's my question for her rebuttal, because I'm trying to figure out what the practical impact of all this is going to be if he's in the wind. A mess. Yeah, that's the concern I have. But I mean, it's all very interesting for lawyers. That concern because he hasn't established the due process violation and he also hasn't established any prejudice. The prejudice analysis here, I think, has to be a two-tiered analysis. There has to be, first, there has to be a nexus between the alleged deficiency in service and his failure to appear. Not just the grounds for relief, because the only grounds he was seeking for relief was pre-conclusion voluntary departure. That means he had to actually show, he would have, he has to show he actually would have shown up for the hearing had the notice been different or better. And there's no... Is this the alien who used the same address in his TPS application? Exactly. And in addition, he later represented when he filed the motion that he abandoned, the motion to reopen, he represented that he had provided the correct address. Well, and didn't he reference the fact that there was a pending or prior deportation order? That's correct. In his TPS application, which was filed exactly one year to the day after his removal order, he set forth that the fact that he had been subject to a prior removal order and the place where that order was entered. And on that basis, the district court made a finding of fact that the notice was sufficient. Correct. Correct. And that finding is not clearly erroneous. Defendant has not shown that that finding was clearly erroneous. The only thing defendant has pointed to in that regard were some of the stickers that were elsewhere in the record. And I looked at them more carefully than before. And I realized that one of them does have a date on it in 2006, these unused stickers. One has a date from 2006, which suggests it was put there in connection with the TPS application. And there's no indication that they ever did send something to the wrong address since the stickers are still there. And doesn't it use the correct zip code for whatever north or south? Correct. The notice that was sent to defendant used the correct street address, the correct zip code, and it had an apartment number. So only the address where he actually lived had the zip code and only that address had apartment numbers. And that was the basis for the district court's factual finding. Yes, the court found that it was sent to that address, which satisfied the requirement of due process because that was reasonably calculated to reach him. My colleagues have any other questions? We'll have Ms. Rivera. Have a rebuttal. Thank you, Your Honor. I'd like to first address the administrative exhaustion question. The immigration judge was required to determine whether that was a knowing involuntary waiver of Mr. Brizuela's waiver of his appeal. That's Ninth Circuit law. That's from Ramos. That's from Ubaldo Figueroa. And that's from this court's recent decision in De La Mora Cobian. Can you answer my question? Where is your client? Do further factual development? Is he even around? Your Honor, I don't currently, as I stand here today, know exactly where Mr. Brizuela is. But, you know, this goes to whether this case is moot at all. And there are practical considerations and collateral consequences. And we address that in the reply brief. Some of those go to the extent he was deported by the government while this appeal was pending. If he comes back lawfully and attempts to seek withholding of removal, then this 1326 conviction could still prejudice him in a bondage conviction. I get that. I get that. I understand the concern about the criminal conviction. I'm just trying to figure out, as a practical matter, what remedies are available to us and what will happen depending on what the panel decides to do. Well, to the extent that the government has deported him while this appeal was pending, then I think the fault there lies with the government, Your Honor. If they want to proceed with this conviction, they have to decide whether to parole him back into the United States, if possible, or not. Right. But first, we've got to find him. And you don't know where he is, and they don't know where he is. So I'm not sure where that leaves us. I don't think there's any information. Sorry, Your Honor. I don't think there's any information currently about where he is. I don't know if that's the kind of information the government could get or when or where they deported him. That's not in the record. I've never discussed it with Ms. Woodhead. I did want to address, though, briefly the administrative exhaustion question. And that's because, as I was saying, this court has consistently required that the immigration judge has to determine whether a waiver is voluntary in knowing. And here there are two good reasons why the government wouldn't be able to show that on remand, that this was knowing involuntary. And so, one, I'm looking at the affirmative misadvice that was provided to Mr. That's at ER 57. That shows that that was produced in May 2010, right when Mr. Brizuela was litigating the motion to reopen his proceedings. And that affirmatively misadvised him that the timeline to file a motion to reopen had passed five years before that. And so, to the extent that that played any role in his motion to withdraw, then that couldn't have been a knowing involuntary waiver because it was premised on misadvice. And then second... Excuse me, counsel. I'm concerned about Judge Tallman's question about the practical significance. I mean, if we were to... Are you relying on the proposition that because if we were to remand, and it's clear that after Palomar, you have to prevail on all three grounds for challenging this collateral order, that because the government has the burden of showing that it's a knowing involuntary waiver, it doesn't matter whether your client is there since the government has that burden. Is that your argument? No, Your Honor. I was bringing up this issue of the knowing involuntary waiver because to the extent that it's remanded and that Mr. Brizuela-Aldana is permitted to make this I'm suggesting that there's good reason to think that he can show that he satisfies D-1 and D-2. Can show that even in his absence? I don't know that he could show that in his absence, Your Honor. And again, I don't know if he has been deported. I'm not currently aware of his whereabouts, but that's through no fault of my own. And I don't believe it's through any fault of Mr. Brizuela-Aldana's. So to the extent that he was deported and is unable to demonstrate that this information should have been dismissed in the first instance, that's through no fault of his own. That's the government's fault. Isn't that in his A-file? I thought the deportation would be shown by a form that's filled out at the time that he's deported. Certainly in the A-file that was produced at the time that this was litigated, his initial deportation order was in the A-file. To the extent that one of those was reinstated following his conviction in this case, that's just not currently in the record, Your Honor. No, no, no. But there should be another deportation notice that's filled out when he was last deported from the United States. There may be, Your Honor, and that's just not in the record because it wasn't in the record and so the government may have access to that. The government may be able, to the extent this is remanded, the government may be able to come forward with an updated A-file that shows Mr. Brizuela-Aldana was deported last week or last month after he completed his sentence. But that's just not information that I'm currently aware of. I'd like to ask Ms. Woodhead if she can enlighten us on this issue while we've got her, with your permission. Absolutely. Ms. Woodhead? Yes, Your Honor. I confirmed with the deportation officer that defendant was turned over to ICE by the Bureau of Prisons on October 8, 2019 and was deported on October 30, 2019. That's all the information I have on it. All right. And that was not in the A-file that Ms. Rivera had, is that correct, Counselor? No, because this is what happened after he served, he's completed his prison sentence in this case. So what we're talking about is what happened when he completed the prison sentence in this case, which was obviously, Ms. Rivera's right, it was obviously after the record was complete in this case. All right. Thank you, Counselor. Unless my colleagues have any further questions, this case has been submitted and thank you, Counselor, for your very helpful presentations. Thank you both. Thank you.
judges: Lipez, TALLMAN, LEE